

Aaron T. Martin (AZ 028358)
Catie B. Kelley (AZ 037066)
Martin Law & Mediation PLLC
11811 N. Tatum Blvd., Suite 3031
Phoenix, AZ 85028
(602) 812-2680
aaron@martinlawandmediation.com
catie@martinlawandmediation.com

Ángel J. Valencia (*Pro hac vice* forthcoming)
District of Columbia Bar No. 1552471
Liberty Justice Center
7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735
 (512) 481-4400
avalencia@libertyjusticecenter.org

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Dr. Matthew Abraham, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Board Of Regents, for and on behalf of the University of Arizona,<br><br>Defendant. | **Complaint** |

Plaintiff Dr. Matthew Abraham through the undersigned counsel, hereby files this Complaint for compensatory damages, declaratory and injunctive relief against Defendant Arizona Board of Regents ("ABOR"), for and on behalf of the University of Arizona ("UA").

**INTRODUCTION**

1. This is an action for unlawful retaliation and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. Abraham, a tenured professor at UA, opposed and complained about hiring and selection practices he reasonably believed were race-based, discriminatory, or preferential on the grounds of "diversity, equity, and inclusion" ("DEI").

3. Following his protected activity—including internal grievances, a 2020 demand letter through counsel, a public records suit, and a U.S. Equal Employment Opportunity Commission ("EEOC") charge—UA officials took adverse actions against him, including excluding him from committee appointments, namely the Committee on Academic Freedom and Tenure ("CAFT") and the English Department Annual Performance Review Committee ("APR") based upon a purported conflict of interest arising from his grievances, among other pretextual reasons.

4. UA also maintained and enforced DEI policies and practices that used race as a factor in hiring and selection decisions, retaliating against Abraham for opposing those practices.

**PARTIES**

5. Plaintiff Dr. Matthew Abraham ("Abraham") is a natural born United States citizen of Indian heritage, a resident of the State of Arizona, and has been employed at all relevant times by UA as a tenured faculty member in the Department of English.

6. Defendant Arizona Board of Regents ("ABOR") is a body corporate created under the Constitution of the State of Arizona that governs Arizona's public universities, including the University of Arizona, and is an "employer" within the meaning of Title VII.

**JURISDICTION AND VENUE**

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Abraham asserts claims under Title VII of the Civil Rights Act of 1964.

8. Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the District and UA conducts business within the District.

## ADMINISTRATIVE EXHAUSTION

9. Abraham timely filed a Charge of Discrimination with the EEOC (No. 540-2022-02125) alleging race discrimination and retaliation for engaging in protected activity.

10. The EEOC issued a Determination and Notice of Rights with a right-to-sue-letter dated September 2, 2025. This suit is filed within 90 days of Abraham's receipt of that letter.

11. Abraham's Title VII claims are within the scope of the EEOC charge and related allegations, including retaliation arising from the same nucleus of facts.

## FACTUAL ALLEGATIONS

**Abraham's Background**

12. Abraham is a tenured faculty member at UA and, at all relevant times, was qualified and willing to serve on CAFT and APR.

13. UA hired Abraham as a tenured professor in 2013, and Abraham achieved the rank of full professor in 2016.

14. Throughout his employment at UA, Abraham has performed his duties competently and successfully, contributing to UA's scholarship and governance. He has consistently been eligible for professional advancement and leadership opportunities within UA's governance structure, including service on CAFT and APR.

**Protected Activity**

15. Beginning in 2017 and continuing through 2022, Abraham made good-faith complaints to UA officials concerning discriminatory hiring and selection practices that, in his view, unlawfully favored candidates based on race and other protected characteristics under Title VII. His complaints included formal internal grievances, public records requests, and written communications to UA leadership opposing such practices.

16. Between November 2018 and September 2020, Abraham submitted multiple public records requests under Arizona's Public Records Law, A.R.S. § 39-121 *et seq.* to obtain documents concerning faculty hiring, leadership appointments, and committee proceedings.



17. On September 15, 2020, Abraham, through counsel, served a formal demand letter on UA and ABOR documenting instances of race-based discrimination and practices favoring DEI criteria in ways that adversely affected him in hiring and selection decisions. The letter expressed Abraham's opposition to perceived race-based decision-making and alerted ABOR and UA to Abraham's protected opposition to what he reasonably believed were unlawful practices. *See* Exhibit 1.

18. In September 2021, Abraham filed a special action in Pima County Superior Court against ABOR (No. C20214306) to compel compliance with the public records laws regarding hiring and selection records. The trial court eventually denied relief, and the Arizona Court of Appeals, Division Two, affirmed on January 6, 2025, in *Matthew Abraham, PhD v. Arizona Board of Regents*, No. 2 CA-CV 2024-0073.

19. Thereafter, Abraham continued to be outspoken about his opposition to the use of DEI-preferential criteria and race-based decision-making in hiring, evaluation, and committee selection processes.

20. Abraham filed a Charge of Discrimination with the EEOC on August 4, 2021, charging UA with race discrimination due to being denied leadership positions in the Department of English on racial grounds, and in favor of lesser qualified persons of different racial classifications than Abraham's. On August 12, 2021, the EEOC notified UA of Abraham's Title VII charge (No. 540-2021-03104), and later treated the charge as unperfected.

21. Abraham filed a subsequent Title VII Charge of Discrimination with the EEOC on March 1, 2022 (No. 540-2022-02125), alleging retaliation and racial discrimination by UA officials for engaging in protected activities. Specifically, Abraham alleged that he was retaliated against when he was excluded from serving on CAFT and APR because he engaged in protected activity. *See* Exhibit 2. The EEOC issued a Determination and Notice of Rights on September 2, 2025. *See* Exhibit 3.

22. Abraham's efforts—internal complaints, counsel's demand letter, public records litigation, and EEOC charges—constitute protected opposition and participation activity under Title VII and the First Amendment.

**Governance Structure and Applicable Policies**

23. ABOR Policy 6-201 and UA's faculty governance instruments—including the University Handbook for Appointed Personnel ("UHAP"), the English Department Constitution (Fall 2021), Faculty Constitution and Bylaws (July 2020), and the Nominating Committee processes—govern faculty service on CAFT and APR.

24. As applied, these governance policies and processes gave UA discretion to consider eligibility criteria when proposing nominees. UA officials leveraged and manipulated these provisions to exclude Abraham from leadership opportunities on pretextual grounds.

**Adverse Employment Actions: Exclusion from CAFT**

25. CAFT is a high-profile faculty governance body at UA charged with hearing and evaluating disputes implicating academic freedom, tenure, and related faculty rights. CAFT handles high stakes employment decisions, including faculty dismissals and tenure decisions. Service on CAFT is widely regarded as a prestigious and influential assignment that materially enhances a faculty member's standing, visibility, and prospects for future leadership roles within UA.

26. After UA became aware of Abraham's protected activities and complaints on or around October 5, 2021, UA officials excluded him from consideration for CAFT, constituting overt and materially adverse actions under Title VII.

27. Shortly after, and in the midst of, Abraham's protected activities and complaints, UA officials involved in the faculty nominating and selection process adopted and implemented practices designed to label and exclude "problematic" faculty members from CAFT—those who had previously filed grievances, challenged administrative practices, or otherwise engaged in protected conduct—from eligibility or consideration for grievance-related committees.



28. On October 5, 2021, Nominating Committee member Dr. Katharine Zeiders ("Zeiders") reported that Jane Cherry ("Cherry"), Senior Program Coordinator at UA's Faculty Center, identified certain faculty as ineligible based on being "impartial faculty" with "hidden agendas," described such faculty as "problems for the university," and stated they were "not easy to work with"—criteria unrelated to any published eligibility rule and consistent with excluding faculty who had filed grievances or challenged UA practices.

29. On October 5, 2021, Zeiders documented that Cherry had marked Abraham and others as "ineligible" for CAFT, not due to bylaws or rank, but due to Cherry's personal experience, rumors that they were "problematic," and a concern that Abraham "may have a CAFT case"—referencing protected grievance activity as a basis to disqualify.

30. On January 24, 2022, Cherry wrote to members of the Nominating Committee that Faculty Center staff "have always guided the [Nominating Committee] with the selection process based on confidential information that the office has been privy to," and that "not all faculty are deemed appropriate," citing "facts about certain candidates' past dealings with committees, the Office of General Counsel, and Faculty Senate."

31. In a presentation to the Nominating Committee, Cherry indicated the faculty members she deemed "problematic"—including Abraham—by highlighting their names in red.

32. UA applied extra-statutory, subjective filters—such as whether a candidate had filed grievances, challenged administrative decisions, or been involved with the Office of General Counsel—to pre-screen, target, and disqualify candidates for CAFT.

33. UA's bylaws and eligibility criteria for CAFT and other grievance committees do not prohibit service by faculty members who have filed grievances or participated in protected activity. Nevertheless, UA used protected grievance-related activity as a *de facto* disqualifier for committee consideration.

34. In 2022, when Abraham was proposed for CAFT consideration, UA officials declared him ineligible for supposedly having a "conflict of interest" due to his pending grievances, in the exercise of protected activities.



35. UA asserted before the EEOC, among other things, that Abraham's "pending grievance" created a "conflict of interest" rendering him ineligible for CAFT. *See* Exhibit 4.

36. UA's internal communications reveal that CAFT disqualifications were driven by disfavor of so-called "problematic" faculty members and those with "past dealings" with the Office of General Counsel or committees.

37. UA's use of a "pending grievance/conflict of interest" basis to exclude Abraham was not grounded in any neutral, consistently applied rule. It was selectively invoked in response to protected activity, including Abraham's internal discrimination complaints regarding his opposition to DEI-based selection practices.

38. In addition to the pretextual "conflict of interest" justification, UA later proffered an ostensibly neutral rule excluding "degree-seeking" faculty members from service or leadership positions on CAFT.

39. Abraham was also pursuing a Juris Doctor degree at the University of Arizona's James E. Rogers College of Law at the time of his exclusion from CAFT.

40. UA's invocation of a degree-seeking restriction is pretextual and inconsistent with prior practice, as numerous faculty members who were enrolled in degree programs were permitted to serve in comparable or identical committees during the same period.

41. UA selectively and discriminatorily applied the degree-seeking exclusion to Abraham after he engaged in protected activities, such as filing internal grievances, sending a demand letter through counsel, and initiating a public records lawsuit.

42. At no point prior to Abraham's protected activity did UA treat his scholarly degree enrollment as disqualifying for leadership or service.

43. UA's pre-screening, red-flagging, and disqualification of Abraham tainted UA's Nominating Committee process and constituted adverse employment actions that would dissuade a reasonable employee from engaging in protected activity.



44. UA's explanations—citing alleged conflicts of interests arising from Abraham's protected activity and ineligibility for pursuing a law degree—are designed to mask retaliation for his protected speech and activity.

45. The exclusion from CAFT materially impacted Abraham's university service opportunities, visibility, influence in faculty governance, and leadership opportunities.

46. In response to Abraham's protected activities, the Faculty Senate Chair requested that the Committee of Eleven, a standing faculty governance body, conduct an independent investigation into the CAFT selection process.

47. In January 2023, the Committee of Eleven issued a written report finding a series of irregularities that unchecked will continue to allow, inappropriate interventions from a number of sources against an eligible faculty member's right to participate fully in elections to CAFT. The report concluded that non-elected staff had improperly influenced which faculty were treated as eligible for CAFT, and that these interventions were not grounded in any published criteria.

48. The Committee of Eleven's report determined that the practice of using undisclosed criteria, including labeling certain faculty members as "problematic" or as having "hidden agendas," to screen them out of CAFT consideration was inappropriate and inconsistent with Faculty Bylaws. The report further found that there is no provision in the applicable governing documents rendering a faculty member categorically ineligible to serve on CAFT by virtue of having filed a grievance or having matters pending before faculty committees.

49. In light of the Committee of Eleven's findings, the CAFT selection process was reformed whereby Abraham was allowed to run for a position on CAFT. Abraham began serving a three-year term on CAFT on July 1, 2024, after being elected.

50. In August 2025, however, UA removed Abraham from CAFT. UA's purported and pretextual reason for the removal was that Abraham had been recommended for dismissal from employment by his Dean and the Provost on August 20, 2025, mainly because Abraham held concurrent employment at the Arizona Attorney General's Office.

51. The true reason for Abraham's removal from CAFT in August 2025 was his history of protected activity, including EEOC charges, internal grievances about discriminatory and retaliatory practices in faculty hiring and committee selection, and his public records litigation.

52. The sequence of events—Abraham's repeated protected activity, the Committee of Eleven's findings, his subsequent election to CAFT when the selection process was corrected, and then his sudden ouster from CAFT in August 2025 on a thin concurrent employment rationale—demonstrates that UA's purported justification was pretextual and that Abraham was again targeted and excluded from CAFT in retaliation for his opposition to UA's DEI/race-based hiring and selection policies.

**Adverse Employment Actions: Exclusion from APR**

53. APR is an English Department faculty governance body at UA that reviews annual faculty performance and provides rankings for faculty members in the areas of teaching, research, and service. Service on APR is an important professional opportunity that enhances a faculty member's standing, visibility, and prospects for future leadership roles.

54. From 2015 through 2018, Abraham successfully served on APR. During his APR service, Abraham performed his duties competently and without any findings of bias, misconduct, or conflict of interest. His prior appointment confirms that he met all stated eligibility requirements and that UA considered him a suitable APR member.

55. After Abraham began raising formal concerns about race and DEI-based practices, UA faculty declined to return Abraham to APR, effectively excluding him from further service.

56. In March 2022, the English department chair nominated Abraham to serve on APR. In what was expected to be a pro-forma vote ratifying the chair's nomination, the department council instead voted against Abraham 7-4. At the time of the election, the APR was understaffed, and the department had a difficult time filling positions.



57. At the time UA declined to elect Abraham to APR service, UA decisionmakers were aware that Abraham had filed internal grievances, served the September 15, 2020 demand letter through counsel alleging race discrimination, filed and pursued a public records special action against ABOR in September 2021, and initiated EEOC litigation.

58. Like his exclusion from CAFT, Abraham's exclusion from APR was based on his past protected activities which were known to the department council voters at the time.

59. Faculty members who had not filed grievances or publicly challenged UA's DEI practices were not prevented from serving on APR.

60. Any purported neutral rationale for declining Abraham's election to APR service—such as alleged "degree-seeking" ineligibility or generalized neutrality concerns—was not contained in a consistently enforced policy and had not been applied to bar his initial APR appointment or his prior APR service. Those rationales emerged only after Abraham engaged in protected activity.

61. Termination of APR service caused Abraham concrete professional harm, including loss of an ongoing leadership and service role, reduced influence over performance evaluations for Abraham's peers, and loss of service/leadership credit important for evaluation and professional advancement.

**Knowledge and Timing**

62. The exclusion from CAFT and APR occurred after UA had actual knowledge of Abraham's protected activities. Namely, Abraham's public records requests, internal grievances, demand letter, and special action lawsuit.

63. As a direct and proximate result of UA's unlawful retaliation and race-based discrimination, Abraham suffered lost professional opportunities, reputational injury, and emotional distress, and he will continue to suffer such harms absent relief.

64. Venue and jurisdiction are proper because the events giving rise to these claims occurred in this District, and UA is located and does business here.

# CAUSES OF ACTION

## COUNT I

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)**

65. Abraham realleges and incorporates by reference paragraphs above as though fully set forth herein.

66. Title VII prohibits an employer from retaliating against an employee because the employee has opposed any practice made unlawful by Title VII or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

67. Abraham engaged in protected activity under Title VII, including:

   a. Opposing what he reasonably and in good faith believed to be racially discriminatory hiring and selection practices tied to DEI criteria, through internal grievances and communications to UA officials;

   b. Filing a public records special action against ABOR, resulting in a January 6, 2025, appellate affirmance by the Arizona Court of Appeals, Division Two (2 CA-CV 2024-0073), to obtain records concerning the challenged hiring processes;

   c. Serving a demand letter on September 15, 2020, through counsel, challenging race/DEI discriminatory practices and pressing public records requests concerning hiring;

   d. Filing a Charge of Discrimination against UA on August 4, 2021, with the EEOC alleging race discrimination, for being denied leadership positions in the Department of English on racial grounds in favor of lesser qualified persons of different racial backgrounds than Abraham's; and

   e. Filing a Charge of Discrimination with the EEOC alleging race discrimination and retaliation by UA for engaging in protected activity, which resulted in a Determination and Notice of Rights on September 2, 2025.



68. UA took materially adverse actions against Abraham, in violation of his constitutional rights, that would dissuade a reasonable employee from making or supporting a charge of discrimination, including but not limited to:

 a. Pre-screening, red-flagging, and declaring Abraham "ineligible" for CAFT under a purported and pretextual "conflict of interest" based on his protected activity;

 b. Excluding Abraham from consideration for service on CAFT and APR;

 c. Tainting the nominating and selection process through staff-driven gatekeeping and disqualifications based on Abraham's protected activity and perceived opposition to UA's practices; and

 d. Removing Abraham from CAFT in August 2025, invoking a purported concurrent employment issue as a pretext, when in reality the decision was motivated by his protected activity.

69. UA knew of Abraham's protected activity when it took these adverse actions.

70. Abraham's protected activity was a but-for cause of the adverse actions.

71. By the acts and omissions described above, UA retaliated against Abraham in violation of Title VII.

72. As a direct and proximate result, Abraham suffered and continues to suffer lost professional opportunities, reputational harm within faculty governance, emotional distress, and other compensable damages.

73. Abraham seeks all remedies available under Title VII, including injunctive and declaratory relief, compensatory damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## COUNT II

### Race Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2(a)

74. Abraham realleges and incorporates by reference paragraphs above though fully set forth herein.

75. Title VII prohibits an employer from discriminating against an employee with respect to terms, conditions, or privileges of employment because of the employee's



race, and from using race as a motivating factor in employment decisions, even if other factors also motivated the practice.

76. Abraham, an Indian-American natural-born United States citizen, is a member of a protected class and has standing to challenge UA's race-based policies and practices.

77. Abraham was qualified and eligible for consideration to serve on UA committees, including CAFT and APR.

78. UA, through its nominating and selection processes, considered race and race-related DEI criteria in a manner that unlawfully affected the availability of governance opportunities and committee placements. The process implemented non-bylaw demographic balancing and extra-statutory criteria, disfavoring individuals, including Abraham, who challenged those practices.

79. Abraham suffered adverse treatment with respect to the terms, conditions, and privileges of employment—including participation in faculty governance, committee service, and attendant professional recognition and influence—because of race and/or because he opposed race-based practices. UA's exclusion of Abraham under a pretextual "conflict of interest" rationale was part and parcel of a selection regime that used racial criteria and retaliated against those who opposed such use.

80. Similarly situated faculty members outside Abraham's protected class, and those whose candidacies aligned with the UA's race-based and DEI selection preferences, were treated more favorably in the nominating and selection process, including being advanced or not disqualified based on grievance activity.

81. UA's proffered reasons for excluding or disadvantaging Abraham—such as a "conflict of interest" due to a pending grievance, being a "degree-seeking" faculty member, or holding concurrent employment— are pretextual. Contemporaneous communications show pervasive reliance on subjective and extra-bylaw factors, including demographic balancing and disqualifying "problematic" faculty members, which correlate with UA's race-based selection objectives.

82. By the acts and omissions described above, UA discriminated against Abraham with respect to the terms, conditions, and privileges of employment because of race, in violation of Title VII.

83. As a direct and proximate result, Abraham suffered and continues to suffer damages, including lost professional opportunities, reputational harm, emotional distress, and other compensable injuries.

Abraham seeks all remedies available under Title VII, including injunctive and declaratory relief, compensatory damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment on their behalf as follows:

A. Entering a declaratory judgment declaring UA violated Title VII's anti-retaliation provisions by retaliating against Abraham for engaging in protected activity;

B. Entering a declaratory judgment declaring UA violated Title VII's anti-discrimination provisions by discriminating against Abraham on the basis of race in their hiring and selection practices;

C. Enjoining UA from using, referencing, or relying on Abraham's protected activity (including internal grievances, public records requests or litigation, and EEOC charges) as a basis to deem him conflicted, ineligible, or otherwise disfavored for any position, committee, or leadership opportunity;

D. Requiring UA to implement neutral, non-retaliatory, and non-discriminatory criteria for selection to CAFT, APR, and other leadership roles, and to publish those criteria in applicable governance documents;

E. Requiring UA to provide training to officials and nominating bodies regarding Title VII retaliation and to revise policies/processes that treat protected activities as conflicts of interest;



F.   Ordering UA to expunge any records labeling Abraham as conflicted, "problematic" or ineligible due to his grievances, public records litigation or EEOC activity, and to notify decisionmakers and nominating bodies of the expungement;

G.   Ordering UA to consider Abraham for CAFT, APR, and comparable leadership/service positions under lawful, neutral criteria without regard to his protected activities, and to conduct such processes under Court supervision for a defined period;

H.   Enjoining UA from using race/DEI-preferential criteria in a manner that violated Title VII, as applied to Abraham, and require lawful safeguards.

I.   Awarding Abraham compensatory damages for emotional distress, reputational harm, loss of professional standing, and other non-pecuniary injuries caused by UA's unlawful conduct, plus applicable interest;

J.   Awarding Abraham his costs and reasonable attorneys' fees pursuant to the Enforcement Provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k);

K.   Awarding any such other additional relief as the Court may deem just and proper.

DATED this 25th day of November, 2025.

By /s/*Aaron T. Martin*
Aaron T. Martin
Catie B. Kelley
Martin Law & Mediation PLLC
11811 N. Tatum Blvd., Suite 3031
Phoenix, AZ 85028

Ángel J. Valencia (*Pro hac vice* forthcoming)
Liberty Justice Center
7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735

*Attorneys for Plaintiff Dr. Matthew Abraham*

